IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JONATHAN CONRAD FULLER,

        Plaintiff,               No. CIV S-04-1276 FCD EFB P

     vs.

CALIFORNIA DEPARTMENT OF       FINDINGS AND RECOMMENDATIONS
CORRECTIONS, et al.,

        Defendants.

_____/

    Plaintiff is a prisoner without counsel suing for alleged civil rights violations.  *See* 42 U.S.C. § 1983.  His August 2, 2005, second amended complaint asserts the following claims: (1) from September 2000 through April 2001, defendant Dr. Altchek refused to examine plaintiff to determine the source of plaintiff's severe pain, which was caused by tuberculosis of the bone and ultimately required plaintiff to undergo surgery and to suffer neurological deficiencies; (2) defendant Dr. Dhillon ordered diagnostic tests unrelated to plaintiff's pain; (3) defendant Dr. Mehta referred plaintiff to a psychiatrist for plaintiff's complaints of pain; (4) defendants Donahue, Andreasen and Ramirez-Palmer learned through the appeals process that plaintiff was not receiving proper medical attention but did not remedy the situation; (5) in February 2004, plaintiff fell in the shower and defendant Pai only gave plaintiff Tylenol; (6) in February 2004, after plaintiff threatened to file a grievance complaining of defendant Murray's threatening and

1

harassing behavior, Murray retaliated by entering plaintiff's cell and destroying plaintiff's personal property.  Plaintiff also raises a number of negligence claims, which are governed by California law.  Defendants Murray, Ramirez-Palmer, Andreasen and Donahue contend that plaintiff has not satisfied the exhaustion requirement with respect to any claims against them. Defendants Mehta, Dhillon, Altchek and Pai contend that there is no genuine dispute about whether they were deliberately indifferent to plaintiff's serious medical needs.  All defendants also assert that plaintiff failed to preserve his state-law claims under the California Tort Claims Act.

For the reasons explained below, the court finds that all defendants are entitled to summary judgment and that the court should dismiss plaintiff's state-law claims.

**I.     Facts**

At all times relevant to this action, plaintiff was a prisoner at the California Medical Facility.  Defendants Altchek, Dhillon and Mehta were physicians.  Defs.' Mot. for Summ. J., Exs. B, C, & D.  Defendant Donahue was a medical technical assistant.  Defs.' Mot. for Summ. J., Ex. F, Decl. of Donahue ("Donahue Decl."), ¶ 2.  One of Donahue's responsibilities was to interview prisoners who filed grievances and appeals about medical issues.  *Id*., ¶¶ 1-6.  Donahue interviewed plaintiff about a grievance in which plaintiff alleged that he had been denied an MRI.  *Id*.  Donahue asserts in his declaration that after this interview, he would have consulted with the Chief Medical Officer about the appeal.  *Id*.  Donahue did not have the authority to take any actions, make any recommendations about or to grant or deny prisoners' appeals.  *Id*. Actually resolving medical appeals falls to the physicians.  *Id*.

Defendant Andreasen was the Chief Medical Officer.  Defs.' Mot. for Summ. J., Ex. G, Decl. of Andreasen ("Andreasen Decl.").  Until November 2001, Ramirez-Palmer was the warden.  Defs.' Mot. for Summ. J., Ex. H, Decl. of Ramirez-Palmer ("Ramirez-Palmer Decl."), ¶ 1. From November 2001 until December 2004, she was the Northern Region Administrator for the CDCR, and was not in any way involved with prisoners' appeals or citizen's complaints filed

1   with the Internal Affairs Division of the Office of Investigative Services.  *Id.*, ¶ 2.  While she

2   was the warden, all prisoner appeals and citizens' complaints received at the warden's office

3   were sent to the Appeals Coordinator.  *Id.*, ¶ 3.  The appeals coordinator would log them for

4   processing.  *Id.*   Grievances and internal affairs complaints about medical treatment were sent to

5   the medical services division for review and handling by the chief Deputy of Clinical Services or

6   his designees.  *Id.*   Ramirez-Palmer had no direct supervision over the medical services

7   department at CMF.  *Id.*, ¶ 4.  Ramirez-Palmer asserts in her declaration that she does not recall

8   receiving any correspondence or other notice about an internal affairs complaint filed by plaintiff

9   or his wife about plaintiff's medical care.  *Id.*, ¶ 5   If the warden's office had received such a

10  document, it would have been sent to the medical division.  *Id.*

11       Plaintiff was incarcerated at the Contra Costa County Jail between 1991 and 1993.

12  Defs.' Mot. for Summ. J., Ex. A, Deposition of Plaintiff ("Pl.'s Dep."), at 12.  While there, he

13  was exposed to tuberculosis.  *Id.*, at 13.  Based on x-rays of his chest, he was informed that he

14  had not contracted the disease.  *Id.*, at 106.  Plaintiff did, however, experience flu-like symptoms

15  for which he was treated with an oral medication.  *Id.*

16       In July of 1999, plaintiff was transferred to CMF.  Pl.'s Dep., at 9.  On November 16,

17  2000, he went to the medical clinic complaining of left lower chest pain, which became sharp

18  and aggravated when lying down on either side.  Defs.' Mot. for Summ. J., Ex. C, Decl. of

19  Mehta ("Mehta Decl."), Attach. at 5.   Dr. Mehta examined him, and found that the pain was not

20  aggravated with deep breathing or standing, and plaintiff had no fever, constipation or heartburn.

21  *Id.*; Pl.'s Dep., at 147.  Upon applying pressure, Dr. Mehta found plaintiff's lower left two ribs

22  were tender.  Mehta Decl., Attach., at 5.  Dr. Mehta noted that November 9, 2000, x-rays of

23  plaintiff's left ribs revealed no abnormalities.  *Id.*, at 4-5.  Dr. Mehta ordered four medications

24  for pain and stomach upset, a series of blood tests and a urinalysis to rule out urinary tract

25  infection.  *Id.*, at 4.  Finally, he ordered plaintiff to remain in bed for 48 hours and to return to the

26  clinic for a follow-up examination.  *Id.*, at 6.

1    In December of 2000, Dr. Altchek saw plaintiff for pain in the left side of his chest.

2    Defs.' Mot. for Summ. J., Ex. B, Decl. of Altchek ("Altchek Decl."), ¶ 5.  Dr. Altchek physically

3    examined plaintiff, ordered blood tests and a CT scan of the area of his rib cage.  *Id*.  Dr. Altchek

4    also prescribed medications for plaintiff, including for pain.  *Id*.  Plaintiff underwent the CT

5    scan, which revealed no abnormalities.  *Id*., ¶ 6.  Since plaintiff had not expressed an experience

6    of any pain in the region of his spine, no x-rays of this area were ordered.  *Id*.  Other than the

7    pain in his left side, plaintiff did not report any other symptoms to Altchek.  *Id*.  Altchek did,

8    however, refer plaintiff to defendant Dr. Mehta.

9    On December 15, 2000, plaintiff submitted a grievance, designated Log. No. 00-M-1656.

10   Andreasen Decl., Attach., at 1. In it, he claimed that physicians had failed to diagnose the source

11   of his severe pain, and that Altcheck in particular insisted that nothing was wrong.  *Id*., at 1-7.

12   The appeal was rejected as too lengthy, but he resubmitted it.  Defs.' Mot. for Summ. J, Ex. I,

13   Decl. of Perry ("Perry Decl."), Attach. 1.  The informal level of review was bypassed.

14   Andreasen Decl., Attach., at 1.  Thus, on January 22, 2001, defendant Donahue interviewed

15   plaintiff about the appeal and Andreasen  reviewed it on the first formal level.  *Id.*, at 9.

16   Andreasen denied the appeal.  *Id.*  Plaintiff had undergone a CT scan and of the three physicians

17   who had examined plaintiff since November of 2000, not one believed that an MRI would

18   contribute to the diagnosis.  *Id.*  T. Emigh asserts that CDCR records show that plaintiff did not

19   pursue this appeal to the second formal level of review or to the Director's Level of Review.

20   Defs.' Mot. for Summ. J., Ex. L, Decl. of Emigh ("Emigh Decl."), ¶ 8.

21   Plaintiff returned to the clinic on January 23, 2001.  Mehta Decl., ¶ 6.  He reported mid-

22   back pain, indicating his spine, and "excruciating pain" in the left lower chest area and radiating

23   epigartrium.  *Id*., Attach., at 2.  Dr. Mehta examined plaintiff, and determined that plaintiff had

24   no headaches, fainting episodes or regurgitation and no injury within the past three years.  *Id*., at

25   3.  He also noted that the chest CT scan from January 3, 2001, was negative for abnormalities.

26   *Id.*, at 3-4.  Dr. Mehta decided to rule out acid peptic disease and other stomach disorders.  *Id.*

To this end, he ordered an upper GI series and an H. Pylori antibody test. *Id.* He examined plaintiff, and found that plaintiff's complaints could be somatic. *Id.* Thus, in addition to the diagnostic measures, Dr. Mehta also referred plaintiff to the psychiatry clinic to rule out possible somatization disorder, obsessive-compulsive disorder. and personality disorder. *Id*., at 6.

Plaintiff was rushed to the emergency room on February 7, 2001, for dizziness and for pain in his left side and in the mid-quadrant of his stomach. Altchek Decl., Attach., at 10. Shortly after his arrival, he lost consciousness, but would cry when moved to one side or the other. *Id.* Altchek examined him, and noted that the upper GI series results suggested duodenitis and duodenal peptic ulcer disease. *Id.* Therefore, he recommended continuing the current medications, plus Tylenol. *Id.*, at 4. He ordered a follow-up examination with Dr. Dhillon within seven to ten days. *Id.* On February 14, 2001, plaintiff returned to the clinic for pain and burning in his stomach. Defs.' Mot. for Summ. J., Ex. D, Decl. of Dhillon ("Dhillon Decl."), Attach., at 4; Pl.'s Dep., at 143-44. Dr. Dhillon noted that the blood tests showed an elevated level of H. Pylori and the upper G.I. series revealed duodenitis, and that sickle cell anemia should be ruled out. *Id.* Dhillon also noted that plaintiff had obvious compression of the T-8 vertebra in his lower back, which had been causing numbness in his feet and genitals since September of 2000. Dhillon Decl., Attach., at 16. He ordered medication for the duodenitis and elevated H. Pylori levels and referred plaintiff to the orthopedic clinic for his low back pain. *Id.*, at 13, 16.

On February 27, 2001, defendant Dhillon examined plaintiff for complaints of mid-back pain, and found that plaintiff clinically was stable. Dhillon Decl., Attach., at 12.. He prescribed Tylenol, recommended continuing the current medications at least until plaintiff was seen by specialists, and ordered a follow-up appointment. *Id.* On March 2, 2001, Dhillon renewed plaintiff's medications and referred plaintiff to the G.I. clinic. Dhillon Decl., Attach., at 2. Despite the medications, plaintiff's discomfort continued. Dhillon Decl., ¶¶ 5-8; Altchek Decl., ¶ 10. Dhillon saw plaintiff on March 15, 2001, for a follow up exam. Dhillon Decl., Attach., at

1, 9.  Dhillon recommended continuing with the medications and following up with the GI, neurology and orthopedic clinics, and he authorized plaintiff to remain in his cell so that he would not have to work for several weeks.  *Id.*  He instructed plaintiff not to lift more then 10 pounds, not to stand for more than 30 minutes and instructed plaintiff to return for a follow-up appointment.  *Id.*, at 9, 10.

Plaintiff was examined by Altchek on March 20, 2001, who ordered a follow up appointment with Dr. Dhillon within three work days.  *Id.*, at 1,8.  Plaintiff's medical records show that on this date Dr. Altchek "threw [plaintiff] out when he stated where did I get my medical degree, etc."  Altchek Decl., Attach., at 8.

On March 27, 2001, plaintiff again saw Altchek, who ordered blood tests, including a complete blood count, and a one-week lay in and cell feeding.  Altchek Decl., ¶ 10.  Dr. Altchek also ordered an MRI of the L-S spine, and noted a previous order for an MRI of the T-8 region.  *Id.*  On April 6, 2001, plaintiff underwent an MRI on his spine.  Altchek Decl., Attach., at 25.  The radiologist found significant compression of the T-8 vertebra, and determined that it had progressed since a February 13, 2001, radiological examination.  *Id.*  While the findings were consistent with a "pathological fracture," the cause could also be a cancer, an infection such as tuberculosis, or a fungus.  *Id.*

In April 2001, plaintiff went to the Queen of the Valley Hospital in Napa for spinal surgery.  Altchek Decl., ¶ 11; Andreasen Decl., ¶ 8.  The surgeons performed a biopsy of plaintiff's spine, and ultimately diagnosed plaintiff with Pott's Disease.  Pl.'s Dep., at 14-15, 99; Altchek Decl., ¶ 11; Andreasen Decl., ¶ 8.  This is a rare condition in which tuberculosis infects the spine instead of the lungs.  Altchek Decl., ¶ 11; Andreasen Decl., ¶ 8.  After recovering from the surgery, plaintiff returned to CMF.

On February 20, 2004, defendant Dr. Pai saw plaintiff in the prison emergency clinic for plaintiff's report that he had fallen in the shower.  Defs.' Mot. for Summ. J., Ex. E, Decl. of Pai ("Pai Decl."), ¶ 4.  Plaintiff reported minimal discomfort in the sacral area and ankle pain, and he

1  was able to move his lower extremities without difficulties.  Pai Decl., Attach., at 1.  On

2  examination, Pai found that plaintiff was alert, awake and responsive.  *Id.*  Plaintiff was able to

3  bend down to unlace his shoes without visible discomfort, and his left ankle was slightly

4  swollen.  *Id.*  Pai prescribed Motrin 600 mg, ordered an ice pack and Ace bandage for his ankle,

5  and authorized plaintiff for cell-feeding for one week.  *Id.*  Pai diagnosed plaintiff with left ankle

6  sprain and musculoskeletal back injury with minimal discomfort, and requested that plaintiff

7  return for a follow-up appointment within three days.  *Id.*

8         In addition to his medical treatment, plaintiff also complains of pictures that were

9  removed from his wall.  At the time of the events giving rise to plaintiff's claims against Murray,

10  pictures from magazines were considered contraband under CDCR policy.  Defs.' Mot. for

11  Summ. J., Ex. K, Decl. of Norris ("Norris Decl."), ¶ 5.  Thus, they were subject to confiscation

12  by guards at any time.  *Id.*  Also, guards may designate where on the cell walls prisoners may

13  post photographs or other items.  *Id.*, at 4.  Ordinarily, guards delineate these with marks painted

14  on the cell wall.  *Id.*  Prisoners may not mark or select their own areas for posting photos and

15  documents.  *Id.*  They must request that guards select an area for them.  *Id.*  If a prisoner exceeds

16  the designated wall space, then any guard or custodial staff may remove whatever is posted

17  outside the designated area.  *Id.*  Prison officials consider the unbridled posting of papers and

18  photographs on cell walls to be a security issue because cluttered walls could hinder cell

19  searches, or conceal contraband or holes in the wall.  *Id.*

20         In February 2004, defendant Murray entered plaintiff's cell and removed magazine

21  pictures from plaintiff's cell wall.  Pl.'s Dep., at 21, 26, 13; Defs.' Mot. for Summ. J., Ex. J, Def.

22  Murray's Resp. to First Set of Interrogs., Nos. 2, 3, 4; Norris Decl., at ¶¶ 4, 5, 6.  At deposition,

23  plaintiff could not recall whether the pictures Murray removed were from magazines.  Pl.'s Dep.,

24  at 21, 26.  Nor does he recall whether the family photographs he now has are the same he had the

25  time Murray searched his cell.  *Id.*  On February 15, 2004, plaintiff filed a grievance about Sgt.

26  Murray, designated Log. No. 04-M-282.  Perry Decl. & Attach., at 41.  In it, he complained that

1  defendant Sgt. Murray entered plaintiff's cell, used profanity and tore photographs of plaintiff's

2  family and unspecified magazine pictures off the wall.  *Id*., at 41, 44.  He requested that Murray

3  be reprimanded, relieved of duty, fined and that plaintiff's pictures be returned.  *Id*., at 41.

4      The first informal level of review was bypassed.  A correctional lieutenant investigated

5  the matter and interviewed both plaintiff and defendant Sgt. Murray.  The reviewer found that

6  Murray ordered plaintiff to remove the pictures so as to comply with institutional regulations and

7  when plaintiff refused, Murray entered the cell and removed them himself.  *Id*., at 45.  Murray

8  denied using profanity.  *Id.*  The officer who accompanied Sgt. Murray that day verified

9  Murray's account.  *Id*., at 45.  Therefore, on April 2, 2004, plaintiff's allegations were

10  determined to be unfounded and the appeal was denied.  *Id.*

11      On April 15, 2004, plaintiff appealed to the second formal level of review, calling

12  Murray and the other officers liars, denying having been argumentative and asserting that no one

13  spoke to prisoners in the surrounding cells as part of the investigation.[1]  *Id*., at 42.  Plaintiff does

14  not recall appealing defendant Murray's conduct to the second formal level of review.  Pl.'s

15  Dep., at 38, 40.  There is no evidence of the disposition of the appeal on the second formal level

16  of review.  Nor is there any evidence that plaintiff appealed to the Director's Level of Review.

17      Defendants Ramirez-Palmer, Andreasen and Donahue have submitted the declaration of

18  the then Acting Chief of the Inmate Appeals Branch, T. Emigh, in support of their contention

19  that plaintiff did not file any grievance against them about the allegations he makes in this

20  action.  Defs.' Mot. for Summ. J., Ex. L, Decl. of Emigh ("Emigh Decl.").  T. Emigh states that

21  he searched CDCR records for any appeal that plaintiff may have filed against Andreasen,

22  Donahue, Murray and Ramirez-Palmer about his medical treatment at CMF.  Emigh Decl., ¶ 8.

23  He found no record that any appeal about plaintiff's medical care at CMF had been accepted for

24  review on the Director's Level of Review.  *Id.*, ¶ 10.  At deposition, plaintiff conceded that no

25

26          [1]  The remainder of this appeal, at page 43, is not legible in its electronic form.

1   one prevented him from submitting appeals on any of these matters for review on the Director's

2   Level of Review.  Pl.'s Dep., at 38, 40.

3          Plaintiff did not properly submit his claims to the State of California' Victim's

4   Compensation and Government Claims Board (formerly known as the State Board of Control).

5   Perry Decl., ¶¶ 4, 5.

6   **II.    Rule 56 Standards**

7          Summary judgment is appropriate when there is no genuine issue of material fact and the

8   movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

9   *Catrett*, 477 U.S. 317, 322 (1986).[2]  As explained by the Ninth Circuit, the utility of Rule 56 to

10  screen which cases actually require resolution of disputed facts over material issues (through

11  presentation of testimony and evidence at trial) has been clarified and enhanced.

> In three recent cases, the Supreme Court, by clarifying what the
> non-moving party must do to withstand a motion for summary
> judgment, has increased the utility of summary judgment. First, the
> Court has made clear that if the non-moving party will bear the
> burden of proof at trial as to an element essential to its case, and
> that party fails to make a showing sufficient to establish a genuine
> dispute of fact with respect to the existence of that element, then
> summary judgment is appropriate.  *See Celotex Corp. v. Catrett*,
> 477 U.S. 317 (1986).  Second, to withstand a motion for summary
> judgment, the non-moving party must show that there are "genuine
> factual issues that properly can be resolved only by a finder of fact
> because they may reasonably be resolved in favor of either party."
> *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis
> added). Finally, if the factual context makes the non-moving
> party's claim implausible, that party must come forward with more
> persuasive evidence than would otherwise be necessary to show
> that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be
> argued that *any disagreement* about a material issue of fact
> precludes the use of summary judgment.

---

[2]  On November 22, 2004, the court expressly informed plaintiff of the requirements for
opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v.
Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and
*Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).  Pursuant to *Wyatt*, 315 F.3d at
1120, n.4, that order also expressly informed plaintiff of the requirements for opposing a failure
to exhaust motion that is supported by affidavits or declarations and exhibits.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).  There can be no genuine issue as to any material fact where there is a complete failure of proof as to an essential element of the nonmoving party's case because all other facts are thereby rendered immaterial.  *Celotex,* 477 U.S. at 323.

With these standards in mind, it is important to note that plaintiff bears the burden of proof at trial over the issue raised on this motion, i.e., whether the defendant acted with deliberate indifference to the plaintiff's safety.  Equally critical is that "deliberate indifference" is an essential element of plaintiff's cause of action.  Therefore, to withstand defendant's motion, plaintiff may not rest on the mere allegations or denials of his pleadings.  He must demonstrate a genuine issue for trial, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989), and he must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

**III.   Analysis**

"As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  Here, plaintiff's action arises under 42 U.S.C. Section 1983 and the Eighth, First and Fourteenth Amendments.  The defense asserted by defendants Andreasen, Donahue and Ramirez-Palmer arises under 42 U.S.C. § 1997e(a).  To have brought this action in the first place, he must have exhausted the available administrative remedies within the prison. 42 U.S.C. § 1997e(a).  To prevail at trial, he must prove that defendants Altchek, Dhillon, Mehta and Pai deprived him of his Eighth Amendment

1   rights while acting under color of state law.  To prove an Eighth Amendment violation, plaintiff

2   must show by a preponderance of competent evidence that they knew plaintiff suffered a serious

3   medical need and that they were "deliberately indifferent" to it.  *Farmer v. Brennan*, 511 U.S.

4   825, 834, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

5       **A.  Failure to Exhaust**

6       A prisoner may bring no action under 42 U.S.C. § 1983 or any other federal law until he

7   has exhausted available administrative remedies.  42 U.S.C. § 1997e(a).  This requirement is

8   mandatory.  *Booth v. Churner*, 532 U.S. 731, 741 (2001).  A prisoner seeking leave to proceed *in*

9   *forma pauperis* in an action challenging the conditions of his confinement brings an action for

10  purposes of 42 U.S.C. § 1997e when he submits his complaint to the court.  *Vaden v.*

11  *Summerhill*, 449 F.2d 1048, 1050 (9th Cir. 2006).  Therefore, a prisoner must exhaust available

12  administrative remedies before filing any papers in federal court and the prisoner is not entitled

13  to a stay of judicial proceedings in order to exhaust.  *Id.* at 1051;  *McKinney v. Carey*, 311 F.3d

14  1198 (9th Cir. 2002).  As noted above, the law now is clear that section 1997e(a) requires

15  "proper" exhaustion, including compliance with any requirement that a grievance be filed within

16  a particular time-frame.  *Woodford v. Ngo*, ___ U.S. ___, 126 S.Ct. 2378, 2384-2385, 2387-2388

17  (2006).  Failure to exhaust is an affirmative defense, which defendant has the burden of proving.

18  *Jones v. Bock*, ___ U.S. ___, 127 S.Ct. 910, 921 (2007).

19      California prisoners may, appeal "any departmental decision, action, condition, or policy

20  which they can demonstrate as having an adverse effect upon their welfare."  Cal. Code Regs. tit.

21  15, § 3084.1(a).  An appeal must be submitted "within 15 working days of the event or decision

22  being appealed, or of receiving an unacceptable lower level appeal decision."  *Id.*, at § 3084.6(c).

23  An untimely appeal may be rejected.  *Id.*, at § 3084.3(c)(6).  The regulations require the use of

24  specific forms, but contain no guidelines for grievance content.  *Id.*, at §§ 3084.2, 3085.

25  Prisoners ordinarily must present their allegations on one informal and three formal levels of

26  review, although the informal and the first formal levels may be bypassed.  *Id.*, at § 3084.5.  A

11

division head reviews appeals on the first formal level, *see id*., at § 3084.5(b)(3) (authorizing

bypass of the first formal level when the division head cannot resolve it), and the warden or a

designee thereof reviews appeals on the second formal level.  *See Id*., at § 3084.5(e)(1).

Generally, completion of the third level, the Director's Level of Review, exhausts the remedy.

*Id*., at § 3084.1(a).  If at any time a prisoner abuses the appeals process, as by submitting "[a]n

appeal containing false information, or profanity or obscene language," the appeal must be

rejected.  *Id*., at §§ 3084.3(c)(8), 3084.2(f).

Defendants Murray, Ramirez-Palmer, Andreasen and Donahue assert that plaintiff did

not pursue to the Director's Level of Review his concerns about his medical care.  Defs.' Mot.

for Summ. J., at 26.  As noted above, plaintiff alleges that Ramirez-Palmer, Andreasen and

Donahue learned of plaintiff's inadequate medical care through the appeals system, but failed to

take reasonable measures to ensure that plaintiff received proper care.  Plaintiff alleges that

defendant Murray entered his cell, threatened plaintiff and destroyed his personal property.

Plaintiff filed separate administrative appeals about these allegations.  Therefore, the court

addresses the appeals separately.

### 1. Defendants Ramirez-Palmer, Andreasen and Donahue

With respect to these defendants, it is important to recall that the exhaustion requirement

is designed to "filter out the bad claims and facilitate consideration of the good," by "allow[ing]

[jail] officials an opportunity to resolve disputes concerning the exercise of their responsibilities

before being haled into court." *Jones v. Bock*, 127 S. Ct., at 914.  The entire CDCR appeals

process is designed so that at each successive level, not only the "problem" described by the

prisoner is reviewed, but also how the lower-level reviewer handled the problem inherently is

reviewed.  Thus, for example, Donahue interviewed plaintiff on the first formal level of review,

and Andreasen reviewed it and denied relief.  An appeal to the second formal level of review

would constitute an appeal not only about the problem outlined in the grievance, but also of how

Donahue and Andreasen handled it.  The same reasoning applies to an appeal to the Director's

Level of Review.  Deciding not to modify the lower-level reviewer's decision constitutes a review of that person's actions, and resolves plaintiff's initial problem and any problem he has with the reviewer's handling of the initial problem.  Therefore, the court concludes that the CDCR's prisoner grievance system does not require a prisoner to file a grievance complaining about every administrative appeal reviewer's handling of a grievance.  Thus, insofar as Donahue and Andreasen made decisions about plaintiff's appeals, plaintiff exhausted if he pursued the grievance to the Director's Level of Review.  The crux of the matter, then, is whether plaintiff in fact pursued his grievance to that level.  As noted above, it is undisputed that plaintiff did not appeal to the Director's Level of Review.  Thus, plaintiff has failed to exhaust his administrative remedies and defendants Ramirez-Palmer, Donahue and Andreasen are entitled to judgment as a matter of law.

### 2. **Defendant Murray**

Similarly, there is no genuine dispute that plaintiff failed to exhaust his administrative remedies as to his claim against defendant Murray.  Defendant Murray has submitted evidence that plaintiff did not file any grievance about his conduct after he was denied relief on the first formal level of review.  Plaintiff does not remember whether he pursued this grievance beyond this level.  Moreover, he concedes that no prison official prevented him from filing appeals.  Thus, there is no dispute about whether he appealed Murray's conduct to the Director's Level of Review.  A reasonable fact finder could find in plaintiff's favor on this issue.  Accordingly, the motion must be granted with respect to defendant Murray.

### B.  Medical Claims

Plaintiff claims that defendants Mehta, Dhillon, Altchek and Pai were deliberately indifferent to his serious medical needs.  These defendants seek summary judgment on these claims.

Prison officials violate the Eighth Amendment when they are deliberately indifferent to prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A prison official

is deliberately indifferent when he knows of and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference may be shown by the denial, delay or intentional interference with medical treatment or by the way in which medical care is provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Prison personnel risk Eighth Amendment liability if they knowingly prescribe specifically contraindicated medications, fail to treat a known, serious medical condition or ignore a physician's prescribed treatment. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989); *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989); *Wakefield v. Thompson*, 177 F.3d 1160 (9th Cir. 2003).

However, of particular significance here, negligence in diagnosing or treating a medical condition, does not violate a prisoner's Eighth Amendment rights. *Hutchinson*,  838 F.2d at 394.

The court will examine plaintiff's claims in turn.

### 1. <u>Dr. Mehta</u>

Plaintiff claims that defendant Dr. Mehta was deliberately indifferent to his complaints of pain by referring plaintiff to a psychiatrist. Dr. Mehta contends that plaintiff cannot adduce evidence to establish a genuine dispute about whether he was deliberately indifferent to plaintiff's serious medical needs. The parties do not dispute that plaintiff had a serious medical condition, i.e., ongoing severe pain which, once diagnosed turned out to be tuberculosis that had infected his bones. *See  McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd sub nom. on other grounds*, *WMX Tech., Inc. v. Miller*, 104 F .2d 1133 (9th Cir. 1997) (condition is serious if  the failure to treat it could result in further significant injury or in unnecessary and wanton infliction of pain). The only question, therefore, is whether Mehta's response to plaintiff's complaints and symptoms constituted deliberate indifference.

It is undisputed that Mehta examined plaintiff several times. On November 16, 2000, plaintiff went to the medical clinic with lower chest pain, which worsened when he was lying down on either side. Defendant Mehta examined him and questioned him about other possible

1   symptoms.  He found that plaintiff's left lower ribs were tender and noted that recent x-rays

2   showed no abnormalities.  He therefore prescribed medications to treat plaintiff's symptoms and

3   authorized plaintiff to remain in bed for 48 hours, and he ordered diagnostic testing.  Mehta next

4   saw plaintiff on January 23, 2001.  He reported back pain, indicating his spine, and severe left

5   lower chest pain which radiated to the epigartrium.  Again, Mehta examined plaintiff and

6   questioned him about other possible symptoms.  He noted that a recent CT scan was negative for

7   abnormalities, and decided to rule out certain gastro-intestinal disorders.  Therefore, he ordered

8   additional diagnostic tests.  He also referred plaintiff to psychiatry to rule out certain

9   psychological disorders that could cause plaintiff to experience the physical symptoms he

10  reported.  This course hardly supports a claim of indifference.  To the contrary, it strongly

11  suggests that although defendant Mehta was having a difficult time diagnosing the etiology of

12  plaintiff's problems, he clearly was not indifferent to them.

13          Plaintiff asserts that the referral to a psychiatrist shows that Mehta knew of plaintiff's

14  serious medical needs, yet refused to attend to them.  On the present record, the court cannot

15  conclude that Mehta's concern that plaintiff symptoms might be due to a somatization disorder

16  was, in effect, deliberate indifference to a known health risk.  Quite the contrary, Mehta was

17  trying to identify the origin of plaintiff's symptoms.  He ordered countless tests in an attempt to

18  diagnose a physical disorder.  Ruling out somatization hardly constitutes indifference.  As it

19  turns out, the disease from which plaintiff was suffering is rare.  Thus, it is not surprising that

20  Mehta had a difficult time diagnosing the plaintiff's medical problem.  Tuberculosis is highly

21  contagious and not uncommon in prison populations.  *See Lee v. Armontrout*, 991 F.2d 487, 489

22  (8th Cir. 1993) (recognizing the danger of tuberculosis spreading in prisons).  Furthermore, there

23  is no evidence that Mehta's referral was based on anything other than an inability to isolate a

24  physical diagnosis to explain plaintiff's symptoms.  On the record presently before the court, no

25  reasonable jury could find that defendant Mehta was deliberately indifferent to plaintiff's

26  medical condition.

### 2. **Defendant Altchek**

Plaintiff claims that this defendant refused to take reasonable measures to diagnose his ailment.  Dr. Altchek contends that there is no genuine issue about whether he was deliberately indifferent.  Plaintiff argues that Altchek's conduct on March 20, 2001, creates such an issue. Plaintiff asserts that on this date, Altchek became enraged with plaintiff and expelled him from the medical clinic without prescribing medication for his pain.  It is undisputed that plaintiff saw defendant Altchek in the medical clinic on March 20, 2001.  The evidence of exactly what occurred on March 20, 2001, is sparse.  However, the record shows that plaintiff again reported severe back pain, for which Altchek granted plaintiff another week of rest in his cell and recommended a follow-up appointment in three days.  Plaintiff, who was having persistent pain was apparently frustrated with the inability of the doctors to determine its source and treat it. Altchek does not deny losing his temper with plaintiff.  In fact, he noted on plaintiff's medical chart that he "threw [plaintiff] out when he stated where did I get my medical degree, etc."  The mutually expressed frustration with each other does not violate the Eighth Amendment.

It also is undisputed that Altcheck had examined plaintiff on previous occasions, including on December 12, 2000, when he examined plaintiff for lower left chest pain and on February 7, 2001, when plaintiff arrived in the clinic on an emergency basis.  Altcheck was familiar with plaintiff's symptoms, and with the diagnostic measures and medications that had been ordered.  Defendant Altchek also examined plaintiff on February 13, 2001, when plaintiff complained of "paralyzing pain," which had spread to his middle to lower back.  Altchek ordered x-rays, and plaintiff was diagnosed as having suffered a lower spine fracture.  He prescribed oxycodone for pain, authorized plaintiff to remain in his cell for one week.   Furthermore, despite the March 20, 2001, incident, Altchek saw plaintiff again on March 27, 2001, and ordered blood tests, another one week of bed rest and an MRI of the lumbar-sacral area of his spine.  It can hardly be said that these efforts by Altchek constitute deliberate indifference to plaintiff's medical issues.

Plaintiff asserts that Altcheck did not prescribe him any pain medications on March 20, 2001.  However, Altchek already had prescribed oxycodone for pain.  There is no evidence that plaintiff needed an order to continue the medications that he already was taking or that Altchek knew plaintiff needed new, different medications.  In fact, the record is replete with evidence that various physicians regularly renewed plaintiff's prescriptions or ordered new medications as necessary.  Plaintiff had a rare disease.  These treating doctors had a difficult time diagnosing it.  But they clearly were attentive to the symptoms and were trying to identify the etiology of his problems.  On this evidence, no reasonable jury could find in plaintiff's favor.  Defendant Altchek is entitled to judgment as a matter of law.

### 3. **Defendant Dhillon**

Plaintiff claims that defendant Dhillon was deliberately indifferent by ordering diagnostic tests that were unrelated to plaintiff's pain.  Dhillon contends that plaintiff cannot adduce evidence to show a genuine dispute about whether he was deliberately indifferent.  Plaintiff argues that he has submitted sufficient evidence on this point, asserting that Dhillon denied plaintiff an MRI and prescribed only Tylenol for pain solely because Altchek had convinced him that plaintiff was malingering.  It is undisputed that defendant Dhillon repeatedly examined and treated plaintiff for his reports of pain.  As of February 14, 2001, based on a series of diagnostic tests, Dhillon believed that plaintiff suffered from duodenitis and a bacterial infection.  Dhillon prescribed medication, ordered additional diagnostic testing to rule out other diseases, and noted that plaintiff had a T-8 fracture, the cause of which no one could identify.  Dhillon saw plaintiff again at the end of February and in the beginning of March.  In early March, he renewed plaintiff's medications and referred him to the gastro-intestinal clinic.  He saw plaintiff again on March 15, 2001, and recommended that plaintiff continue taking his medications as well as referring plaintiff again to the gastro-intestinal clinic, the neurology clinic and the orthopedic clinic.  He also authorized plaintiff to remain in his cell to rest and advised plaintiff not to lift over 10 pounds or to stand for more than 20 minutes.

1    Thus, Dhillon knew of plaintiff's symptoms.  But it cannot be fairly concluded from any

2    of the evidence that he was deliberately indifferent to them.  He ordered medications and

3    diagnostic testing, and he recommended that plaintiff be examined by various specialists.

4    However, Dr. Altchek already had ordered an MRI, which plaintiff ultimately underwent.

5    Plaintiff has not produced any evidence that Dhillon should have ordered an MRI before the

6    other physicians or that he in any way delayed plaintiff's undergoing an MRI so as to cause

7    plaintiff further injury.  On the evidence currently before the court, no reasonable jury could find

8    for plaintiff on his claim that Dhillon was deliberately indifferent.  Defendant Dhillon is entitled

9    to summary judgment.

10            **4.  <u>Pai</u>**

11    As noted above, plaintiff claims that defendant Pai was deliberately indifferent to injuries

12    he sustained after falling in the shower.  Defendant Pai contends that plaintiff cannot present

13    evidence showing that she was deliberately indifferent.  Plaintiff claims that Pai refused to treat

14    his injuries, which included the worsening of his condition following surgery.  It is undisputed

15    that on February 20, 2004, plaintiff fell in the shower.  He went to the medical clinic for

16    emergency treatment, which Pai administered.

17    The record shows that plaintiff reported some discomfort in his lower back and in one

18    ankle, and that he was able to move his lower extremities without difficulty.  He was alert,

19    awake and responsive, and could bend down to unlace his shoes without apparent discomfort.

20    Pai prescribed an anti-inflammatory medication, an ice pack and an Ace bandage for the

21    discomfort and slight swelling in plaintiff's ankle.  She also authorized cell-feeding for plaintiff

22    for one week.  In her opinion, plaintiff suffered a sprain in his left ankle and a musculoskeletal

23    injury in his back, which caused minimal discomfort.  She recommended that plaintiff return in

24    three days for a follow-up examination.

25    Plaintiff asserts that he injured his head and ankle, and worsened the condition in his

26    back where he had undergone surgery in 2001.  Plaintiff offers no evidence of a head injury that

1   Pai failed to diagnose and treat, let alone that she deliberately ignored.  Pai's examination

2   included probing for head injuries, as evidenced by her observation that he was alert and awake.

3   Nor does plaintiff adduce any evidence that she ignored any symptoms in his lower back or

4   failed to treat the symptoms she actually observed in that area.  While plaintiff may disagree with

5   her diagnoses and treatment, this is insufficient to survive summary judgment.  *See Jackson v.*

6   *McIntosh*, 90 F.3d 330, 332 (9th Cir.1996) (difference of opinion between inmate and physician

7   regarding treatment does not amount to deliberate indifference).   There is no evidence that the

8   treatment Pai provided was medically unacceptable under the circumstances.  *See Id.*, 90 F.3d at

9   331-32.  On this evidence, no reasonable jury could find in plaintiff's favor.  Accordingly,

10  defendant Pai is entitled to judgment as a matter of law.

11      **C.  Plaintiff's State Law Claims**

12          Plaintiff makes several claims that defendants were negligent in violation of California

13  law.  Defendants contend that these claims must be dismissed because plaintiff failed timely to

14  present his claims as required by the California Tort Claims Act.  *See* Cal. Gov't Code §§ 900, *et*

15  *seq*.

16          As a threshold matter, the court address the question of is pendent of supplement

17  jurisdiction over these state law claims.  Supplement jurisdiction over state law claims exists if

18  the federal claim is sufficiently substantial to confer federal jurisdiction, and there is a common

19  nucleus of operative fact between the state and federal claims.  *Gilder v. PGA Tour, Inc.,* 936

20  F.2d 417, 421 (9th Cir.1991).  Where the court dismisses or disposes of the federal claims it has

21  the discretion to retain or decline supplemental jurisdiction over the state claims.  *See*

22  *Imagineering, Inc. v. Kiewit Pac. Co.,* 976 F.2d 1303, 1309 (9th Cir.1992) (affirming the district

23  court's retention of state law claims after RICO claim was dismissed), *cert. denied,* 507 U.S.

24  1004 (1993).  The decision to retain jurisdiction over state law claims is within the district court's

25  discretion, weighing factors such as economy, convenience, fairness, and comity.  *Id.*

26  ////

1    Here, defendants point out that even if this court is inclined to retain jurisdiction over

2  plaintiff's state-law claims, it cannot.  Plaintiff failed to comply with mandatory procedures that

3  are jurisdictional prerequisites under California law.  In light of California's greater interest than

4  the federal court in sorting out whether plaintiff had a justifiable reason for filing his

5  administrative claim late, and in light of the number of cases filed in this court which involve

6  questions of whether prisoners' federal constitutional rights have been violated, supplemental

7  jurisdiction over these state law claims should be declined.

8  **IV.   Conclusion**

9    For the reasons explained above, the court finds that there is no genuine issue about

10  whether plaintiff exhausted the available administrative remedies for his claims against

11  Andreasen, Donahue, Murray or Ramirez-Palmer and they are entitled to judgment as a matter of

12  law.  Furthermore, plaintiff has failed to demonstrate any triable issue of fact with respect to his

13  claims against Mehta, Altchek, Dhillon or Pai.  Further, the court should decline supplemental

14  jurisdiction over plaintiff's state-law claims.

15    Accordingly, it is hereby RECOMMENDED that defendants' April 20, 2007, motion for

16  summary judgment be granted, judgment be entered in favor of all defendants and that the Clerk

17  of the Court be directed to close this case.

18    These findings and recommendations are submitted to the United States District Judge

19  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

20  after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

23  ////

24  ////

25  ////

26  ////

1   within the specified time may waive the right to appeal the District Court's order. *Turner v.*

2   *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

3   Dated:  March 4, 2008.

4

5                           EDMUND F. BRENNAN
                          UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26